UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                                                         Case No.:  2:06-cr-50-FtM-99SPC

JOSE LUIS ZALDIVAR
ORLANDO LOPEZ
ALFREDO DIAZ ROJAS
YENIER BROCHE ORTIZ
YOEL BERMUDEZ

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Defendant Alfredo Diaz Rojas' Motion to Adopt (Doc. #160) the Defendant Jose Luis Zaldivar's Motion to Suppress Evidence (Doc. # 59) filed on June 5, 2006.  On October 30, 2006, the Court granted the Defendant Alfredo Diaz Rojas' Motion to Adopt Opinion and Order Suppressing Evidence Made on October 16, 2006 (Doc. # 160) filed on October 18, 2006.  The Court construed the Motion to Adopt Opinion and Order Suppressing Evidence as a Motion to Adopt Jose Luis Zaldivar's Motion to Suppress Evidence.  Pursuant to that Order the Court now resubmits its original Report and Recommendation.

As further background, on June 16, 2006, the Defendant Orlando Lopez moved to adopt Jose Luis Zaldivar's Motion to Suppress.  The Court granted Lopez permission (Doc. # 73) to adopt the Motion and join the suppression on June 20, 2006.  In addition to Lopez's Motion, the Defendant Yenier Broche Ortiz also moved to adopt the Motion to Suppress.  However, the Court denied Ortiz's Motion because Ortiz was not present in the vehicle nor in the vessel when police stopped the

Defendants and thus he lacked standing to challenge the stop.[1]

On June 26, 2006, a hearing on the Defendant's Motion to Suppress was held before the Honorable Sheri Polster Chappell, United States Magistrate Judge. At that hearing, the Government was represented by Assistant United States Attorney Douglas Malloy, the Defendant Zaldivar was represented by Joseph Viacava, Esq., and the Defendant Lopez was represented by Charles Harris, Esq. As evidence, the Government presented the testimony of Sgt. Brian Sawyer, Cpl. Amy Spotanski-Tipton, Cpl. Eric Vanessendelft, Cpl. Joseph Scalora, Lt. David R. Johnson, all deputies with the Collier County Sheriff's Office (CCSO), and Agt Sean Mullin of the Immigration and Customs Enforcement Bureau (ICE). The Defense presented no evidence at the hearing.

## TESTIMONY AND EVIDENCE

**Sgt. Brian Sawyer**: (Tr. 9-27).

Sgt. Sawyer has served with the CCSO for seven (7) years. At the time of the incident in question, Sgt. Sawyer was serving as the sergeant supervisor of the CCSO's Criminal Investigation Division. (Tr. 10: 6-7). On April 8, 2005, Sgt. Sawyer was notified to be on the look out (BOLO)

---

[1] At the hearing, the Defendant Ortiz made an oral motion renewing his request to adopt the Motion to Suppress. Ortiz argued that since he was in the boat at some time, the Government might argue that he actually drove the vessel and, therefore, he may have had control and possession over the vessel. However, Ortiz never stated that he actually had control or possession of the vessel at any time only that he assumed the Government's theory might allege that he did and thus, a nexus exists that should allow him to join the motion.
   The Movant bears the burden of establishing specific facts that he has a reasonable expectation of privacy in the property before he can claim that his Fourth Amendment right to privacy was violated. U.S. v. Miravalles, 280 F.3d 1328, 1331 (11th Cir. 2002). A person has a legitimate expectation of privacy protected by the Fourth Amendment if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable. Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). The Defendant's mere speculation that the Government's theory may argue that he had possession and control over the vessel at some point in time is not sufficient for an objectively reasonable person to assume that Ortiz had a privacy interest in the vessel. Ortiz was not at the actual traffic stop and was not seen by any officers during the incident that this Motion to Suppress encompasses. Thus, the Court found that he lacked standing to join the Motion and denied his renewed request.

for any type of smuggling orientated operation such as vessels or vehicles towing large boat trailers. (Tr. 10:8-23 ). The Coast Guard notified the CCSO that it was following a smaller vessel suspected of dropping off illegal aliens on Loggerhead Key. (Tr. 10:18-23). After receiving the BOLO from the Coast Guard, Sgt. Sawyer observed a Nissan pickup truck pulling a three axle boat trailer at highspeed southbound on Highway 41 from Lee County into Collier County. (Tr. 11:11-19). Sgt. Sawyer coordinated with six (6) other CCSO vehicles who followed the vehicle on Hwy. 41 to Naples and observed it pull into a parking lot behind the Walgreens drug store and 7-11 at the intersection of Hwy 41 and 951. (Tr. 11:21-25, 12:1-25, 13:1-2). Sgt. Sawyer also coordinated his movements with Lt. David Johnson of the CCSO Marine Patrol.[2] (Tr. 13:12-14, 15:2-7).

Sgt. Sawyer testified that he did not receive direct information that connected the truck and trailer to the vessel that was being sought by the Coast Guard. (Tr. 15:16-19). However, based upon the information provided by Lt. Johnson, the time of the morning, it was approximately 2:00am when he first observed the truck, and the fact that the truck was traveling at least ten (10) mph over the speed limit, Sgt. Sawyer followed the truck. (Tr. 15:20-25, 16:1).

Sgt. Sawyer observed the truck behind the Walgreens for approximately one and one half hours at which time he approached the vehicle and made contact with the driver. (Tr. 13:19-23). Sgt. Sawyer testified that the Defendant Jose Zaldivar was the driver of the vehicle. (Tr. 14:1-3). According to Sgt. Sawyer, Zaldivar spoke English and had no problems communicating with him. (Tr. 14:3-4). Zaldivar stated that he pulled into the parking lot to wait for the daylight because his trailer light was not working properly and he did not want to drive at night with a malfunctioning light. (Tr. 14:8-19). At that time Sgt. Sawyer left Zaldivar in the parking lot behind Walgreens

---

[2] Lt. Johnson was a Sergeant at the time of the incident and has since been promoted to lieutenant. For the purposes of this R & R the Court will refer to him as Lt. Johnson even though some of the witnesses referred to him as Sgt. Johnson during their testimony.

because he had no reason to detain him, although he testified that he did not find Zaldivar's story credible. (Tr. 14:21-25, 15:1, 23:17-25, 24:1-3).

**Cpl. Amy Spotanski-Tipton:** (Tr. 27-56).

Cpl. Spotanski-Tipton has served with the CCSO for the last five years. She testified to the events that took place in the early morning hours of April 8, 2005.

Cpl. Spotanski-Tipton was driving an unmarked vehicle during the early morning hours of April 8, 2006. She received a BOLO over her computer and via her radio regarding potential smugglers involved in transporting illegal aliens into the country. (Tr. 28:21-24). After receiving a message from Sgt. Sawyer over her Nextel phone, regarding the Defendant's potential involvement in the smuggling, Cpl Spotanski-Tipton participated in the surveillance team that tracked the Defendant down 41 to the parking lot behind the 7-11 and Walgreens. (Tr. 29:13-25, 30:1-15). She observed the truck and trailer parked in the parking lot behind the Walgreens/7-11for approximately ninety (90) minutes. (Tr. 30:20-23). Around 3:45 to 4:00a.m. Sgt. Sawyer made contact with the driver of the truck. (Tr. 30:25, 31:1-10). She was told that the occupants were waiting for daylight to continue traveling to Miami. (Tr. 31:14-19). Cpl. Spotanski-Tipton then left the scene and returned to the substation to finish her shift. (Tr. 31:20-25).

At approximately 6:00a.m. Cpl. Spotanski-Tipton drove past the boat ramp on 591 on her way home from work. (Tr. 32:6-25). While passing the boat ramp ,she observed the Defendant's truck backed up to the boat ramp preparing to load a boat out of the water. (Tr. 32:18-25). Cpl. Spotanski-Tipton watched as Zaldivar drove the truck, a second unidentified man aligned the trailer and the boat, and a third man, also unidentified operated the boat in the water. (Tr. 32:18-22). Cpl. Spotanski-Tipton stated that she observed the loading of the vessel onto the trailer for several minutes. (Tr. 40:3-10). The boat pulled out onto Collier Blvd. and Cpl. Spotanski-Tipton called for

back up. (Tr. 33:2-5). Cpl. Spotanski-Tipton followed the vehicle for about half a mile when a marked patrol car which had also been following the truck pulled the Defendant over at Championship Dr. (Tr. 50:9-12). Cpl. Spotanski-Tipton testified that she noticed the truck was unable to maintain a speed of 35 mph, that the driver was having trouble staying in a single lane, and that the trailer lights were not working properly because they flickered on and off rather than constantly staying on while the trailer was in motion. (Tr.43:1- 44:14). After the stop, she remained on the scene as a secondary unit and remained behind the truck and vessel for the other officers safety. (Tr. 34:9-13).

Cpl. Spotanski-Tipton conducted an inventory search of the vessel. (Tr. 34:17-22). During her inventory search, Cpl. Spotanski-Tipton found three or four fishing rods, some small cans of Vienna sausages, a few long black hair that appeared to have come from a female, and lots of smudge marks and dirt smudge marks all over the vessel. (Tr. 35:5-10, 44:21-45:1-5). Cpl. Spotanski-Tipton stated that she did not find any life preservers (jackets) during her search however, she testified that she did not go into any closed compartments or storage bins. (Tr. 46:5-8-15, ). Lt. Johnson directed her to list the items she found on an inventory sheet. (Tr. 55:3-16).

**Cpl. Eric Van Essendelft:** (Tr. 58-82).

Cpl. Van Essendelft has served with the CCSO for seven (7) years. On April 8, 2005, he received computer updates regarding the alleged smuggling involving the suspect truck and vessel. (Tr.59:3-7, 60: 10-17). He received a call from Cpl. Spotanski-Tipton for back up and proceeded to follow the Defendant's truck. (Tr. 59:8-22). Cpl.Van Essendelft followed behind the truck and noted that the trailer's tag light was not lit and that truck was traveling 30mph below the posted speed limit. Cpl. Van Essendelft stopped the truck which was also unable to maintain its position in a single lane. (Tr.60:3-9, 73:20-25, 74:1-3). Cpl. Van Essendelft acknowledged that he knew the

boat was suspected of being involved in the smuggling of illegal aliens and that Cpl. Spotanski-Tipton requested him to stop the vehicle, however, he testified that he made the stop because of the vehicle's traffic infractions and to aid in the investigation. (Tr. 60:10-25, 61:1-6, 65 18-25, 66:1-8).

Cpl. Van Ess Essendelft made contact with the Defendant Zaldivar who was driving the truck at the time of the stop. (Tr. 61:8-11). Cpl. Van Essendelft testified that he had no problems communicating with Zaldivar – Zaldivar could speak and understand English. (Tr.61:14-19). He asked for the Defendant's driver's license, registration, and the registration for the trailer. (Tr. 61:7-11). Both the truck and boat were registered to the Defendant Zaldivar. (Tr. 67:25, 68:6-8). Cpl. Van Essendelft then investigated the truck's towing capacity, he looked in the owner's manual and found the truck's weight and towing capacity. (Tr. 61:20-24, 62:1-6). The Truck was rated at 7000 lbs. towing capacity while the vessel weighed approximately 20,000 lbs. (Tr. 62:1-6 ). Cpl. Van Essendelft then wrote out three (3) citations, one for a cracked windshield, which he did not see until the truck was pulled over, the second for tag not being lit, and third one for the truck's inability to maintain one lane which impeded the flow of traffic. (Tr. 62:7-13, 68:12-21). Because the truck could not properly tow the vessel, the Defendant was informed that he would have to make other arrangements to tow the boat. (Tr. 62:14-25). Cpl. Van Essendelft then turned the investigation over to officers who had arrived on the scene. (Tr.63:24-25, 64:).

**Cpl. Joseph Scalora**: (Tr. 82-105).

Cpl. Scalora has served with the CCSO for twenty (20) years. He currently serves with the CCSO's Marine Patrol Unit. Cpl. Scalora was notified by Lt. Johnson that deputies from east Naples had stopped a truck towing a boat that was suspected of being involved in smuggling illegal aliens. (Tr. 83:5-17). He proceeded to the scene of the traffic stop located at Collier Blvd. When he arrived on the scene, he noticed a small Nissan pickup truck pulling a thirty-six (36) foot Contender fishing

boat. (Tr. 83:22-25, 84:1-17). Cpl. Scalora testified that based upon his experience with boats[3] he knew that the truck was too small to tow a vessel as large as a thirty-six (36) foot Contender. (Tr. 84:5-12).

Cpl. Scalora begin to inspect the vessel's hull for signs of smuggling. (Tr.85:14-25, 86:1). Cpl. Scalora walked around the right side of the vessel and observed that several of the vessel's registration numbers were starting to peel. (Tr. 90:1-16). Cpl. Scalora observed signs of multiple people on board the vessel such as smudges and footprints. (Tr. 86:20-25, 87:1-6).

Lt. Johnson walked the hull with Cpl. Scalora and then approached the Defendant to discuss what they had found. (Tr.87:5-23). Lt. Johnson informed the Defendant that based on what he had seen he was going to perform a coast guard safety inspection on the vessel. (Tr. 88:6-9). According to Cpl. Scalora the Defendant verbally gave his consent to the search. (Tr. 88:6-15). Once on board Lt. Johnson retrieved the vessel's registration papers and handed them over to Cpl. Scalora. (Tr. 88:19-21).

Regarding the registration numbers, Cpl. Scalora testified that he believed the vessel's exterior registration numbers had been deliberately altered. (Tr. 88:20-25, 89:1-6). However, Cpl. Scalora did state that a vessel over 30 feet long is not required to display the FL numbers as long as it is properly registered with the Coast Guard or with the Federal Government. (Tr. 92:3-23). Nevertheless, the numbers on the port (left) side of the vessel did not match the vessel's registration numbers and the numbers on the starboard (right) side were missing several numbers and/or letters. (Tr. 94:2-25, 95:1-12). Although the vessel did have a proper Florida registration decal, the hull numbers did not contain the required FL number, used on boats registered with the state of Florida,

---

[3]Cpl. Scalora stated that he personally owned a thirty-one (31) foot Contender and that it weighed in excess of 10,000 lbs. (Tr. 85:4-12).

or the DO letters used on boats registered with the federal registration system. (Tr. 94:2-7). He issued a citation to the Defendant for improper registration numbers. (Tr. 89:8-13).

**Lt. David Johnson**: (Tr. 106-136).

Lt. Johnson has served with the CCSO for 32 years and currently serves as the supervisor of the CCSO's Marine Bureau. On April 5, 2005, Lt. Johnson was notified by the Coast Guard out of Key West, Florida, that an active human smuggling case had just occurred in the Dry Tortugas. (Tr. 107:3-9). At 3:00a.m., based on the Coast Guard's report, Lt. Johnson advised the supervisors on patrol to be on the look out for suspicious activity regarding a potential smuggling operation. (Tr.107:10-25, 108:1-12).

Surveillance units informed Lt. Johnson that a small pickup truck was observed pulling a large boat trailer out of Lee County south into Collier County. (Tr. 108:13-24). Lt. Johnson instructed the officers to continue the surveillance and make contact to perform a field interview if possible. (Tr.108:25, 109:1-9). Lt. Johnson was informed that a field interview was performed but that no reason existed to detain the suspects. (Tr. 109:10-21).

On her way home from work, one of the surveillance units passed by the Collier County Boat Ramp and observed the truck loading a large vessel out of the water. (Tr. 109:22-25, 110:1-6 ). The deputy called for back up and the Defendant was subsequently pulled over by deputies of the CCSO. (Tr. 110:7-11). When he arrived at the traffic stop Lt. Johnson was briefed by officers on the scene. (Tr.110:11-22).

Lt. Johnson made contact with the Defendant Zaldivar. (Tr. 112:4-8). The Defendant Zaldivar told Lt. Johnson that he was staying in Lee County at the Sanibel Harbor resort and that he had some engine trouble. (Tr. 112:19-23). Lt. Johnson testified that he noticed that the boat was in disarray like the vessel had been on a long voyage. (Tr. 113:1-3). The vessel was salted with sea

spray, with numerous smudge marks as if a large number of people had been on board. (Tr. 113:4-14). Lt. Johnson informed the Defendant that he was going to perform a Coast Guard safety inspection of the vessel. (Tr. 113:17-20). He asked the Defendant if he would voluntarily consent to the search. (Tr. 113:21-22). The Defendant Zaldivar said yes and nodded up and down. (Tr. 113:18-24).

Once on the boat, Lt. Johnson could see from the dew that there were patent hand prints where it appeared a large number of people had been grasping the supports of the T-top and around the fiberglass area. (Tr. 114:1-9). He also observed a large number of scuffle marks from feet, a large number of empty Vienna Sausage cans and crackers all over the place. (Tr. 114:11-21). Lt. Johnson also found twenty-one (21) life jackets in a hold. (Tr. 114:24-25, 115:1-11). He opened the fish box and observed visible hand and foot prints where it appeared someone had tried to get a perch for their hands and feet. (Tr. 115:18-25, 116:1-5). According to Lt. Johnson, all of the things he observed were evidence indicative of human smuggling activities. (Tr. 116:6-14).

Based upon his observations, Lt. Johnson contacted Agent Sean Mullin with ICE and briefed him on what he had found. (Tr. 116:15-25). Lt. Johnson testified that he never had any trouble communicating with Zaldivar nor did he feel the need for a warrant because Zaldivar consented to the search. He also testified that there were sufficient exigent circumstances and that he had a right to conduct a safety inspection without the need for a warrant. (Tr. 118:13-25, 119:1-5).

**Agt. Sean Mullin**: (Tr. 137-158).

Agt. Mullin has served with ICE for the last three (3) years. Agt. Mullin testified that the boat was being chased by the Coast Guard and was last seen heading west towards the west coast of Florida. (Tr. 137:16-24). Collier County, Florida, in particular, the boat ramp on 591, is known as a hot area for launching and retrieving vessels involved in human smuggling. (Tr. 137:25, 138:1-6).

Agt. Mullin checked with the CCSO and the Coast Guard to gather information on the activities that occurred on that night. (Tr. 138:7-13, 139:1-13). At the time he spoke with CCSO, Agt. Mullin was unaware of the landing on Loggerhead Key. (Tr. 140:19-25). He later learned that twenty-five (25) Cuban Nationals, a number which eventually was corrected to thirty-nine (39), had landed on Loggerhead Key. (Tr. 140:19-25, 141:1). Based upon the information he received from the CCSO and the Coast Guard, Agt. Mullin place an ICE hold on the boat. (Tr. 141:2-7). As far as, Agt. Mullin knew, until he placed the ICE hold on the boat, the Defendant was free to tow the boat away from the CCSO had he been able to obtained the proper towing equipment. (Tr. 141:9-17).

Agt. Mullin took Agt. Silva and fingerprinted all of the Cuban Nationals and interviewed five (5) of them at Pembroke Pines. (Tr. 141:20-25, 142:1-8). Pembroke Pines is where they took the Cubans after they took them to Key West. (Tr. 141:20-23). They told him that they had come to the United States on a small wooden fishing vessel. (Tr. 142:9-16). According to Agt. Mullin in his experience, the wooden fishing boat story is the customary story told by Cuban Nationals being smuggled into the country. (Tr. 142:18-24).

Agt. Mullin contacted the U.S. Attorney's office prior to going to the Pembroke Pines office to interview the Cubans. After the Pembroke Pines interviews, Agt. Mullin procured a search warrant and processed the boat as if it were a crime scene. (Tr. 143:3-17). A forensics team was taken to the boat. They took photos. (143:18-25). During the search, Agt. Mullin opened a compartment in the hull and found twenty-one (21) life jackets. (Tr.144:1-5). The CCSO provided a fingerprint expert who took prints from the boat and compared them to the prints taken by Agt. Mullin at Pembroke Pines. (Tr. 144:6-22).

## DISCUSSION

The Defendants argue that the initial search of the truck, trailer, and boat were the result of

an improper traffic stop and thus, the seizure of the same was without foundation of law. Therefore, the Defendants assert that any evidence discovered as a result of the traffic stop is the fruit of the poisonous tree and must be suppressed. Additionally, the Defendants state that the subsequent search of the vessel at the traffic stop was a violation of the Fourth Amendment and that no probable cause existed for the Court to issue a search warrant later that same day. The Government argues the initial traffic stop was legal, the Defendant consented to the search of the vessel at the site of the traffic stop, and that probable cause existed to issue the search warrant.

### *(1) Whether the Initial Traffic Stop was Legal*

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) *cert. denied,* 534 U.S. 830 (2001). The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. Whren v. U.S., 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L. Ed. 2d 89 (1996) (citing Delaware v Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 S. Ct. 2d 660 (1976)). However, temporary detention of a motorist during a traffic stop is constitutional if probable cause exists to believe a traffic violation has occurred. Whren, 517 U.S. at 810. The Fourth Amendment test for a traffic stop should be whether a reasonable officer would have stopped the vehicle for the purpose of enforcing the traffic violation. Id. Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's action were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L. Ed. 2d 911 (1996).

While on her way home from work, Cpl. Spotanski-Tipton observed the Defendant in the process of uploading a boat at the boat ramp on 591. (Tr. 32:6-25). Cpl. Spotanski-Tipton had

participated in the surveillance on the Defendant during the early morning hours of April 8, 2005, and was familiar with all of the facts and circumstances surrounding the vessel and Defendant. (Tr. 32:6-25). Cpl. Spotanski-Tipton and Cpl. Van Essendelft testified that they followed behind the truck and noted that the trailer's tag light was not lit, it was still dark outside, the truck was traveling below the posted speed limit, and was having trouble maintaining its position in one lane. (Tr. 44:9-14, 60:4-9, 61:2-3). Based on those traffic infractions, Cpl. Vanessendelft initiated the traffic stop. (Tr. 61:4-6).

Fla. Stat. § 316.610 provides that it is a violation for the owner of a vehicle to allow his vehicle to be driven in an unsafe condition or without the required equipment. State v. Kindle, 782 So. 2d 971, 974 (Fla. 5th DCA 2001). Under Fla. Stat. § 316.221(2), a vehicle's tag must be lit so that it is visible from at least fifty (50) feet away. Hilton v. State, 901 So.2d 155, 166 (Fla. 2d DCA 2005) (citing Smith v. State, 687 So. 2d 875, 877 (Fla. 2d DCA 1997) (holding that a dim tag light created probable cause to initiate a valid traffic stop under Florida law)).

The Defendant further argues that Cpl. Van Essendelft's reason for stopping the truck because it was driving too slow and weaving in and out of its lane was invalid. The Defendant states that nothing in the Florida Code specifies that driving too slow is a violation of the law. However, the Florida Supreme Court has upheld traffic stops as valid in instances where the driver was observed driving at a slow rate of speed and weaving within their lane. State Department of Highway Safety and Motor Vehicles v. DeShong, 603 So. 2d 1349, 1352 (Fla. 2d DCA 1992) (citing Bailey v. State, 319 So. 2d 22 (1979)). The Florida Supreme Court reasoned that even though there was no evidence of criminal activity on the part of the driver, the danger created by the erratic driving justified the traffic stop. DeShong, 603 So. 2d at 1352.

Thus, after review of the record and testimony presented at the hearing, it is clear that Cpl. Van Essendelft had probable cause to initiate the traffic stop on the Defendant's truck. Therefore,

the initial traffic stop was valid.

### *(2) Whether the Searches of the Vessel at the Traffic Stop Violated the Fourth Amendment*

The Defendant argues that the subsequent inventory search by Cpl. Spotanski-Tipton and, the search by Lt. Johnson, were improper because the vessel was unlawfully seized and impounded without cause subsequent to an invalid traffic stop. The Government asserts that the Defendant gave consent to the search, that the vessel was not seized at the time of the search and that the subsequent inventory search was done in accord with police protocol for the protection of the Defendant's goods.

### *(a) Whether the Inventory Search of the Vessel was Valid*

When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles contents. South Dakota v. Opperman, 428 U.S. 364, 369, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976). Inventory searches constitute one of the well-defined exceptions to the probable cause and warrant requirements of the Fourth Amendment. Id.; Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L. Ed. 2d 1000 (1983). Inventory searches developed to respond to three distinct needs:(1) the protection of the owner's property while it remains in police custody; (2) the protection of the police against claims or disputes over lost or stolen property; and (3) the protection of the police from potential danger. Opperman, 428 U.S. at 369.

Cpl. Spotanski-Tipton performed an inventory search of the subject vessel after Lt. Johnson and Cpl. Scalora arrived on the scene. (Tr. 34:17-24). The Defendant objects to Cpl. Spotanski-Tipton's inventory search of the vessel on the grounds that the vessel was improperly impounded and that the Government failed to present any criteria under which terms the search was performed. Thus, the Defendant claims the subsequent inventory search was unlawful.

In the instant case, the CCSO impounded the vessel due to safety concerns. (Tr. 62:14-25). Here, Cpl. Van Essendelft inspected the trailer and the truck's towing capacity. (Tr. 61:21-25).

According to the owner's manual, the truck had a towing capacity of 7000 lbs. (Tr. 62:1-6). However, officers at the hearing testified that the vessel weighed approximately 20,000 pounds. (Tr. 62:1-6). The officers felt that the continued towing of the vessel by the Defendant with that particular pickup truck was unsafe and thus, they impounded the vessel. (Tr. 62:14-25). Therefore, based upon the Florida Supreme Court's reasoning in DeShong, the CCSO acted properly by impounding the vessel. Further, the Defendant was instructed that the boat and trailer would be released to him once he had a proper vehicle to tow them. (Tr. 62:16-25, 63:1-4, 141:8-17).

Having found that the vessel was properly impounded, the CCSO had the right to conduct an inventory search under the Fourth Amendment. *See* Opperman, 428 U.S. at 369-379 (holding that it is well established that when police take custody of a vehicle they may conduct a reasonable inventory search of that vehicle, as an exception to the warrant requirement of the Fourth Amendment).

The Defendant also argues that the Government failed to present any criteria under which terms the inventory search was performed.[4] The United States Supreme Court in Florida v. Wells, makes it clear that an inventory search must not be a ruse for a general rummaging in order to

---

[4]The line of cases which deal with this issue speak to the fact that inventory searches must be conducted according to proper police criteria. Colorado v Bertine, 479 U.S. 367, 374, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987); and Beezley v. State, 863 So. 2d 386, 388 (Fla. 2d DCA 2003); Patty v. State, 768 So. 2d 1126, 1127 (Fla. 2d DCA 2000) (citing Florida vs. Wells, 539 So.2d 464 (Fla. S. Ct. 1989)). In Patty and Beezley, Florida's Second District Court of Appeals, citing Florida v. Wells, 539 So. 2d 464, found that an inventory search must strictly comply with the police agency's written criteria. Thus, the Second DCA found that if the policy does not specifically outline the perimeters of the items that can be searched during an inventory search, then the evidence must be suppressed. However, the United States Supreme Court in Florida v. Wells, while affirming the Florida Court's ultimate decision, held that Florida improperly viewed the Bertine decision as very restrictive prohibition against police discretion in performing inventory searches. 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990). The Supreme Court held that standardized criteria are simply a means to prevent the police from using an inventory search to subvert the warrant requirement and open a general investigation. Wells, 495 U.S. at 4. Therefore, the Court will follow the United States Supreme Court's holding in Wells rather than the Second DCA's holdings from Patty and Beezley.

discover incriminating evidence. 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L. Ed. 2d 1 (1990).  The policy or practice governing inventory searches should be designed to produce an inventory.  The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime," Id. (citing Bertine, 479 U.S. at 376).  But, in forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical "all or nothing" fashion. Wells, 495 U.S. at 4.  "Inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger."  Bertine, 479 U.S. at 372.  The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment. Well, 495 U.S. at 4.

In the instant case, Cpl. Spotanski-Tipton conducted the inventory search pursuant to a valid traffic stop and subsequent impounding of the vessel and trailer.  The search was not a ruse to uncover incriminating evidence but was merely to itemize the property found on the vessel to be impounded.  It is clear from the evidence that she did a review of the contents of the vessel and itemized the property on the CCSO Inventory Form. (Tr. 55:3-16).  Therefore, the inventory search was proper.

### (b) Whether the Search by Lt. Johnson was Consensual

"[N]othing in the Constitution prohibits a police officer who permissibly has stopped an individual from requesting permission to conduct a search even if he has no basis for suspecting that the individual is carrying any contraband." U.S. v. Strickland, 902 F.2d 937, 941 n. 3 (11th Cir. 1990); Schneckloth v Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (holding an officer conducting a traffic stop may request consent to search the vehicle).  A consensual search is

constitutional if it is voluntary; if it is the product of an essential free and unconstrained choice. U.S. v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001). In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances. Id. In evaluating the totality of the circumstances underlying the consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found. Id. No single factor is dispositive of the issue. Schneckloth, 412 U.S. at 226-227.

During the hearing, all of the officers who had contact with the Defendant testified that the Defendant Zaldiver could speak and understand English and that throughout the entire process he was cooperative with the police. (Tr. 14:3-4, 61:14-19, 112:10-14). At the scene of the traffic stop, Lt. Johnson informed the Defendant that he was going to conduct a Coast Guard safety inspection of the vessel. (Tr. 113:17-20). He asked the Defendant if he would voluntarily consent to the search. (Tr. 113:15-21). The Defendant Zaldiver nodded affirmatively and said yes. (Tr. 113:15-24). There was no threat of use of force nor any evidence of coercion. Furthermore, no testimony was presented at the hearing to contradict the Government's assertion that the search of the vessel was consensual.

Based upon the testimony and evidence presented at the hearing the Defendant understood what he was asked, was not coerced into giving his consent, and appeared unconcerned about what would be found on board the vessel if it was searched. As a consequence, the Court concludes that the Defendant voluntarily gave his consent for Lt. Johnson to search the vessel. Thus, the Fourth Amendment was not violated by Lt. Johnson's search of the vessel at the scene of the traffic stop.

### (3) Whether the Search Warrant was Valid

The Defendant attacks the affidavit of Agt. Mullin stating that Agt. Mullin's affidavit does not

support any connection between the subject vessel and any of the individuals discovered on Loggerhead Key. Therefore, the Defendant argues, Agt. Mullin's affidavit did not rise to the level of probable cause. In the alternative, the Defendant argues that if the Court finds Agt. Mullin's affidavit did rise to the level of probable cause, then the actual search seizing finger and palm prints off the vessel exceeded the scope of the warrant.

Under the Fourth Amendment, searches should be conducted "pursuant to a warrant." Ornelas v. U.S., 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). There is probable cause to support a warrant "when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." Johnson, 168 Fed. Appx. at 393 (citing U.S. v Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999)). Probable cause may be based upon the affidavit of a law enforcement officer. U.S. v. Johnson, 168 Fed. Appx. 390, 393 (11th Cir. 2006)(citing Fed. R. Crim p. 41(d)(2)). There is a presumption of validity with respect to the officer's affidavit supporting the warrant. Johnson, 168 Fed. Appx. at 393.

In his affidavit, Agt. Mullin noted from the report received from the CCSO that the vessel contained twenty (20) life jackets, along with food and drink for numerous amounts of people, and the vessel was covered/caked with sea salt indicating that the vessel had recently been at sea. (Doc. # 59 Exhibit B). The affidavit for a warrant was limited to the specific vessel encountered by the CCSO on April 8, 2005, and that type of vessel was consistent with the type of vessels used to smuggle humans into the United States. (Doc. # 59 Exhibit B). The affidavit was sworn to on April 8, 2005, the day the incident occurred, therefore, the information was fresh. Those facts combined with the information Agt. Mullin included in his affidavit from the Coast Guard and the CCSO pertaining to the smuggling of thirty-nine (39) Cuban Nationals at Loggerhead Key provided sufficient information for the Court to determine that there was a fair probability that officers would

find contraband or evidence of human smuggling on the vessel. Thus, Agent Mullin's affidavit contained sufficient information for the Court to issue the search warrant.

### *(4) Whether the Seizure of the Latent Palm and Fingerprints Should be Suppressed*

The Defendant also opposes the recovery of latent palm and fingerprints discovered pursuant to the search warrant, arguing that the warrant only specified navigational equipment such as maps, GPS units, and communications equipment such as cell phones. The Government responds that the seizure of the fingerprints was within the scope of the initial consent given by the Defendant, or in the alternative that the seizure of the prints was within the scope of the warrant, or that the prints were the product of inevitable discovery. In addition, the Government argues that the Defendant does not have standing to challenge the seizure of the prints because they were not his prints.

### *(a) Whether the Defendant has Standing to Challenge the Prints*

The suppression of the product of a Fourth Amendment violation can be successfully urged only by the individuals whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Alderman v U.S., 394 U.S. 165, 171-172, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969). The capacity to claim Fourth Amendment protections depends "upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Minnesota v Carter, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998). A person has a legitimate expectation of privacy protected by the Fourth Amendment if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable. Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

In this case, the Defendant readily acknowledged that he was the owner of the vessel, the vessel was registered with the State of Florida in his name, and he was in possession of the vessel

when the initial traffic stop occurred. Thus, it is clear that the Defendant had a subjective expectation of privacy in that vessel that society would be prepared to recognize as objectively reasonable. Thus, the Defendant has the standing to challenge any evidence that was discovered on his vessel pursuant to the search warrant including the latent prints.

### (b) Whether the Prints Fall within the Scope of the Warrant

A search warrant must particularly describe the place to be searched and the persons or things to be seized. Johnson, 168 Fed. Appx. at 393 (citing Fed. R. Crim. P. 41(e)(2)). The purpose of such restrictions is to prevent general searches. U.S. v. Hendrixson, 234 F.3d 494, 495 (11th Cir. 2000). Thus, when a police officer engages in a search outside the proper scope (whether that scope be defined by a warrant or by circumstances), the evidence obtained in that search may be excluded. Id. (citing Horton v. California, 496 U.S. 128, 140, 140 S. Ct. 2301, 110 L. Ed. 2d 112 (1990)).

In this instance, the scope of Agt. Mullin's affidavit attached to the search warrant covered communications equipment, navigational equipment, any paper navigational aids such as maps, and any evidence of alien smuggling in violation of 8 U.S.C. § 132(a)(1)(A)(I). (Doc. # 59 Exhibit B). The officers on scene observed the large number of smudges and hand prints covering the entire vessel. (Tr. 35:5-7-8, 86:20-25, 87:1-6,114:1-11). Lt. Johnson testified that the number of prints was a strong indicator that numerous people had been on the vessel for the purpose of smuggling illegal aliens into the United States. (Tr. 113:6-14, 114:1-23, 116:7-11). Therefore, the officers made impressions of the numerous hand and fingerprints that were visible all over the vessel.

Given that Agt. Mullin's affidavit was specific to the vessel in question and sought any evidence of alien smuggling found on that vessel as well as navigation and communication items, the seizure of the prints was not outside the scope of the search warrant. *See* U.S. v. Jackson, 120 F.3d 1226, 1229 (11th Cir. 1997) (holding that a rifle seized pursuant to a search warrant seeking cocaine

Case 2:06-cr-00050-JES-SPC   Document 171   Filed 10/30/06   Page 20 of 20 PageID 384

did not exceed the scope of the search warrant, even though the firearm was not described in the search warrant, because the officers found the rifle while searching for the cocaine).

Having found that probable cause existed to issue a search warrant for the vessel and further that the seizure of the prints was within the scope of the warrant there is no need to review the Government's alternative arguments.

According it is now

**RECOMMENDED:**

The Defendant Jose Luis Zaldivar's Motion to Suppress Evidence (Doc. # 59) joined by Orlando Lopez and Alfredo Diaz Rojas should be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this   30th   day of October, 2006.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record